UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JOSEPH C. SPERO, MAGISTRATE

DOE 1, DOE 2, and KASADORE RAMKISSOON, on Behalf of Themselves and all other Persons Similarly Situated,

Plaintiffs,

vs.

AOL LLC,

Defendant.

NO. C 06-05866 SBA(JCS)

San Francisco, California
Friday
December 3, 2010
10:23 a.m.

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

**For Plaintiffs via telephone:**
Berman DeValerio
4280 Professional Center Drive
Suite 350
Palm Beach Gardens, FL 33410
(561) 835-9400
(561) 835-0322 (fax)
**BY: MANUEL J. DOMINGUEZ**

**For Plaintiffs via telephone:**
Berman DeValerio
One Liberty Square
Boston, MA 02109
(617) 542-8300
**BY: NATHANIEL L. ORENSTEIN**

(Appearances continued on next page)

Reported by: Lydia Zinn, CSR #9223, RPR, CRR
Official Reporter - U. S. District Court

APPEARANCES CONTINUED

**For Defendant via telephone:** Kirkland & Ellis LLP
Citigroup Center
153 53rd Street
New York, NY 10022
(212) 446-4800
(212) 446-4900 (fax)
**BY: ANDREW G. HORNE**
**JOSEPH SERINO, JR.**

**THE COURT:** Hello, everyone.

**THE CLERK:** Hello. This is Karen, with Judge Spero's chambers. And we're here for the *Doe versus AOL* matter.

I have one housekeeping issue. We need to make sure that you speak up loudly and clearly, and identify yourself each time, because I do have a court reporter here. And, since you're all appearing by phone, you need to really speak up and identify yourselves. So, with that said, appearances, please.

**MR. DOMINGUEZ:** Manuel J. Dominguez, for the plaintiffs, from Berman De Valerio.

**MR. ORENSTEIN:** Nathaniel Orenstein, for plaintiffs, at Berman De Valerio, as well.

**MR. HORNE:** Andrew Horne, of Kirkland & Ellis, for the defendant. I have here with me my partner, Joe Serino.

**THE COURT:** All right. Thank you, everyone. Thank you for the excellent letter.

I thought I would go through and give you my tentative thoughts, and then take some brief argument on the matter.

Just going down the list of issues with respect to the e-mails to or from -- yeah -- AOL employees, between AOL employees and the Legal Department regarding advice or approval of the research.aol.com website, those are clearly privileged materials from the description in the letter.

There are two ways in which the privilege is

potentially waived in this instance. The first would be if the matters -- if a substantial portion of those communications -- a significant part of the communication was revealed to a non-party to the communication.

That has not happened in this case.

And so the remaining argument on waiver is whether or not the defendants have put the content of those communications -- the fact of the communications is not privileged. Presumably, you'll have a privilege log. The fact of those communications -- the content of the communications was the content at issue. There's no evidence before me that the defendants have taken a position in this case which puts the content of those communications at issue; there might be at some point. And so I suppose it could still be the case that at some point, the defendants might take a position that -- in the case that is inconsistent with the assertion of the attorney-client privilege. You know, it would have to be something more than something that implicates just the fact of the communication. It would have to be something that indicates that the tenor of the advice sought or received is at issue. And so far, you know, on this record, there is no such thing with respect to this lawsuit.

As a cautionary note, I think it's very easy to slide over that line in this lawsuit. So I wouldn't say this is a for-all-time ruling; but for now, I would deny it with respect

to the production of those e-mails.

With respect to the documents created by and concerning the privacy task force, I understand that there is a -- this may or may not still be an issue. I don't know. There was, apparently, a list of -- privilege log produced. It is the defendant's obligation to review that; to go back and look at that log, and examine it, and make sure that they are asserting privilege properly.

My view in that connection guides you in your review of those documents -- is that not every document concerning the Privacy Task Force or generated by the Privacy Task Force will be privileged. The Privacy Task Force clearly had both business as well as legal purposes. So, number one, I don't see any evidence that would justify the assertion of work product in this case; but, number two, with respect to attorney-client privilege, unless the communication is between a lawyer at the firm -- a lawyer at the company and someone else at the company concerning legal advice, then I'm not prepared to call it "privileged."

It is -- that's especially the case in a circumstance as this, where there is a mixed purpose for a task force. It would have to be limited to -- those privileges are limited to those communications that actually are either seeking or giving legal advice, but I would charge the defendants with going back through, and figuring out, with that guidance, what's left.

The rest should be produced. If there are some left and there's still disagreement on them, well, then we can talk about those.

With respect to consumer complaints, this has got to be the most ironic of the requests in a lawsuit filed by one Doe One. To seek the identity of the consumers is -- is ironic, to say the least.

I don't see, to be quite serious for a moment, however, how the identity of the consumers who complained or had a comment about this service will help you prove that you can identify those individuals; that you can identify individuals from the search data that was released. I just -- that nexus, seems to me, to be completely lacking. So I don't really understand the argument about why the identity of every consumer who complained has anything to do with what you're trying to accomplish from it.

With respect to document AOLR00413013A -- this is a document from the Security Group to counsel. That is a communication that the evidence indicates was prepared at the request of counsel, so that counsel could give legal advice. I would sustain the privilege as to that.

With respect to the documents used to refresh recollections at a deposition, you know, I'm astounded at how lawyers use that argument or don't use that argument. If a person has their recollection refreshed, if it is, in fact,

refreshed, then you get to see the basis for that. You don't get to see it just because at some point they saw it.

So otherwise, the selection of documents shown a witness is -- is -- highly protected work product, and I would protect it. So I deny productions of those.

I would deny the motion for sanctions, as premature. There hasn't been a sufficient showing that the requested documents ever existed in the beginning of the litigation in the custody of the defendants; no showing how they came to be missing. So there's no way to even talk about fault.

Go ahead and take whatever deposition you want on this subject, but you're going to have to have a much more substantial showing than a letter to justify sanctions.

My tentative on the search of the custodians' files would be to grant that part of the motion. I think that there is -- and we're talking basically about backup tapes that have custodians' files on them. In my judgment, the burden of the fact that not every custodian at AOL follows a uniform retention policy falls on AOL. So I would cause them to search the backup tapes for those records of those custodians, and the same -- for the same scope and same time period that they searched the computers of those custodians. So that's my tentative.

I've got a roomful of folks here, waiting for the criminal calendar. So I will take five minutes of argument

from each side, starting with plaintiff.

**MR. DOMINGUEZ:** Your Honor, I just wanted to argue about the --

**THE COURT:** Could you identify yourself, please?

**MR. DOMINGUEZ:** I'm sorry, your Honor. It's John Dominguez.

I just wanted to talk about the consumer complaints, and tell you --

(Reporter requests clarification)

**MR. DOMINGUEZ:** John Dominguez, from Berman DeValerio, on behalf of the plaintiffs.

I just wanted to take this opportunity to explain a little bit about why the consumer complaints were important to us, for purposes of identifying individuals. In the -- in their arguments to us, in the -- in the -- for class, and as part of this case, you know, they have they have set out and said,

"Well, you can't identify a class.

It's impossible to identify the class,

because you don't have user names."

They've also had an expert come down and say you can't determine who's in this group, based on the data.

The identification of people -- of these consumers would be important, because it would allow us to be able to determine whether you can, in fact, take the data that was

there, and show that people can be identified. And you can do that by using this sample of people who are complaining about their information being put out on the Internet.

**THE COURT:** Well, let's start with that.

I didn't understand the request to be limited to people complaining that their data was being put out in the Internet. Is that the limitation?

**MR. DOMINGUEZ:** Yes, your Honor.

**THE COURT:** Okay. So you're only seeking people who have filed a complaint, saying their data was sought on the Internet. And how many people are in that sample?

**MR. DOMINGUEZ:** It's hard for me to say. I know in the letter, we cited a number of documents; but it would be -- I don't think it's a lot. I would say it's hundreds, but it is quite a few people.

**THE COURT:** And does your expert -- and so this data presumably was collected over a significant period of time, and presumably covered many, many thousands, if not hundreds of thousands, of people searches.

And you think that you will be able to demonstrate from a tiny group of 50, a hundred, a couple hundred people, that you can identify from that data, on anything resembling a class basis or anything else, whose information was exposed? I guess I don't understand that argument.

**MR. DOMINGUEZ:** Well, because, for instance,

your Honor, not to get overly complex, but this was created by -- this database that was created, was created by what's called "hash numbering." There is -- appears to be evidence that hash this type -- in other words, they want to say that the -- that the data -- anonymize it. They want to basically say that the data -- there's no way for you to be able to know who these persons are, because they've sufficiently secured the information.

So we're trying to say there seems to be some evidence that we're trying to explore as part of our expert report that this process could be reversed. And one way to be able to test that would be to get this information about consumers, to see if we can make that claim, your Honor.

**THE COURT:** Well, but I -- I guess I don't understand the connection.

The people who complained -- first of all, it's a really small group. So I'm not sure that scientific basis -- it's of any use to you; but assuming that it is, the consumers who complain don't know that they -- their data was even included in that group. Right?

**MR. DOMINGUEZ:** You're correct, your Honor, that that would be not the type of data that I would be using.

The complaints that -- some of ones that I was able to review -- and I'm not speaking for all of those, because it's difficult for us to know. The data that we were looking

for would be data from those individuals who were actually complaining about this. "This is me. This is -- I -- I am on the Internet," you know. That's the type of data that we would be looking for.

**THE COURT:** So you actually want complaints from individuals who have stated in their complaint that they have identified themselves in the research data?

**MR. DOMINGUEZ:** Yes, your Honor.

**THE COURT:** Complaints.

Okay. So let me turn to AOL, and ask them: Why isn't that directly relevant?

**MR. HORNE:** Your Honor, I think you have hit the nail on the head on a whole lot of points there.

The first the group would be so small, that it would be unscientific to use the data for any purpose. And, frankly, your Honor, sitting here, I'm not sure there are any people in the category that plaintiffs are trying to limit their complaints to; but even beyond that, the fact that someone has purportedly self-identified is not really the issue here.

The question is whether or not someone else can reverse-engineer the data, in order to identify someone. And that's really what plaintiffs are going to have to show, and are trying to show here. And they haven't done that -- enable someone who puts up their hand and says, "Yes, maybe my searches were disclosed," isn't going to help them show you can

actually reverse-engineer this data. There's apparently no link between the self-identification and issues in the case.

**THE COURT:** Okay. Does AOL want to say anything else about the tentative?

**MR. HORNE:** No, your Honor, except for one small issue on the two aspects of the tentative, where you have ordered AOL to, first of all, go back and look at the privilege log and the Privacy Task Force, and then also go back to the backup tapes --

**THE COURT:** Mm-hm.

**MR. HORNE:** -- we'd ask for 14 days, in order to do that.

**THE COURT:** Any objection to that?

**MR. DOMINGUEZ:** No, your Honor.

**THE COURT:** All right. So here's what I'm going to do. Within 14 days of today, I'm going to require that AOL produce the consumer complaints where the consumer states that they have identified themselves in the data issue; within 14 days of today, I'm going to have AOL look at the privilege log, with the guidance I have given on the record here today; and, number three, review the backup tapes for the custodians, and produce the responsive documents.

**MR. HORNE:** This is Andrew Horne, for AOL.

When you say, "review the backup tapes for the custodian," are you referring to the custodians who are

identified in Exhibit 1 to the plaintiffs' letter?

**THE COURT:** No, I am not.

You searched, in this case, a number of custodians. And you did it however you did it.

The sampling of -- that's -- well, I'm not sure what I am talking about, now that I think about it.

Yes. I think what I mean is that, with respect to the custodians listed on the exhibit, you should review the backup tapes.

**MR. HORNE:** Thank you, your Honor.

**THE COURT:** Okay. Thank you very much.

**MR. DOMINGUEZ:** Thank you, your Honor.

**MR. HORNE:** Thank you, your Honor.

**THE CLERK:** Court stands in short recess.

(At 10:42 a.m. the proceedings were adjourned)

**CERTIFICATE OF REPORTER**

I, LYDIA ZINN, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing proceedings in C. 06-05866 SBA(JCS), *Doe v. AOL, LLC,* were reported by me, a certified shorthand reporter, and were thereafter transcribed under my direction into typewriting; that the foregoing is a full, complete and true record of said proceedings as bound by me at the time of filing.

The validity of the reporter's certification of said transcript may be void upon disassembly and/or removal from the court file.

---

/s/ Lydia Zinn, CSR 9223, RPR

Thursday, March 22, 2012